COMMUNITY PUBLISHERS, INC.; and Shearin Inc. d/b/a Shearin & Company Realtors, Plaintiffs,

v.

DONREY CORP. d/b/a Donrey Media Group; NAT, L.C.; Thomson Newspapers, Inc.; and the Northwest Arkansas Times, Defendants.

UNITED STATES of America, Plaintiff,

v.

NAT, L.C. and D.R. Partners d/b/a Donrey Media Group, Defendants.

Nos. 95–5026, 95–5048.

United States District Court, W.D. Arkansas, Fayetteville Division.

June 30, 1995.

Philip S. Anderson, Peter G. Kumpe, J. Leon Holmes, Jeanne L. Seewald, Williams and Anderson, Little Rock, AR, Tom Burke, Burke & Eldridge, Fayetteville, AR, for Community Publishers, Shearin Inc.

Anne K. Bingaman, Constance K. Robinson, Craig W. Conrath, Allee A. Ramadhan, Phillip R. Malone, Burney P.C. Huber, Nora W. Terres, Anne M. Purcell, Alexander Y.

Thomas, Brigid L. Kerrigan, U.S. Dept. of Justice, Washington, DC, Larry McCord, Asst. U.S. Atty., Fort Smith, AR, for U.S.

Jerry C. Jones, Kenneth Shemin, Amy Lee Stewart and Grant Fortson, Rose Law Firm, Little Rock, AR, Woody Bassett, Bassett Law Firm, Fayetteville, AR, for NAT, L.C.

James M. Dunn, Warner, Smith & Harris, Fort Smith, AR, for Donrey.

William J. Butt, Timothy E. Howell, Davis, Cox & Wright, Fayetteville, AR, Jeremy Epstein, Shearman & Sterling, New York City, for Thomson Newspapers.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a consolidated antitrust case in which the United States and private plaintiffs are challenging the purchase of a local daily newspaper, the *Northwest Arkansas Times* ("the *Times*"), by NAT, L.C. Both the government and private plaintiffs contend that this purchase may substantially lessen competition, since NAT, L.C. ("NAT"), has significant shareholders in common with defendant D.R. Partners d/b/a Donrey Media Group ("Donrey"), which owns a competing local daily newspaper, the *Morning News of Northwest Arkansas* ("*Morning News*").

Private plaintiffs and the government both claim that the acquisition violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Private plaintiffs seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; while the government seeks such relief under Section 15 of the Clayton Act, 15 U.S.C. § 25. Private plaintiffs alone bring claims alleging that: (1) NAT's acquisition of the *Times* violates Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization and attempts to monopolize; (2) NAT and Donrey have interlocking directorates in violation of Section 8 of the Clayton Act, 15 U.S.C. § 19; (3) NAT and Donrey violated the notice provisions of the Hart–Scott–Rodino Act, Section 7A of the Clayton Act, 15

U.S.C. § 18a, which requires government notification of certain acquisitions, which was not done in this case.

As will be explained below, the court will find that the challenged acquisition violates Section 7 of the Clayton Act, and it will be unnecessary to judge the transaction under Sections 1 and 2 of the Sherman Act. It will also be unnecessary to reach private plaintiffs' claims arising under Section 7A of the Clayton Act concerning Hart–Scott–Rodino notification and Section 8 of the Clayton Act concerning interlocking boards and directorates.

## I. THE PARTIES AND OTHER INTERESTED BYSTANDERS

**Thomson Newspapers, Inc. ("Thomson")** owned the *Northwest Arkansas Times* ("the *Times*"), a local daily newspaper that competes in the Northwest Arkansas market, until February 6, 1995, when it sold the property to NAT.

**NAT, L.C. ("NAT")** is a limited liability company formed to acquire the *Times* from Thomson.[1] Various Stephens family trusts own ninety-five percent (95%) of NAT's stock, and Jack Stephens is NAT's chairman. The Stephens family business began with the partnership of two brothers, Jack Stephens and Witt Stephens, who went on to build the largest investment banking firm off Wall Street. Stephens family assets are now dispersed among Jack Stephens, his son (Warren Stephens), his brother Witt Stephen's widow (Bess Stephens), and her three children (W.R. Stephens, Jr., Pamela Stephens Rose and Elizabeth Ann Stephens Campbell).

**D.R. Partners d/b/a Donrey Media Group ("Donrey")** is a general partnership which owns the *Morning News of Northwest Arkansas* ("the *Morning News*"), which competes in the same local daily newspaper market as the *Times*.

**Stephens Group, Inc. ("SGI")** owns ninety-nine percent (99%) of Donrey's stock, and the additional one percent is held by Stephens Holding, Inc. SGI is owned entirely by Ste-

---

1. The court was notified per letter dated March 20, 1995, that NAT, L.C., has been renamed

Northwest Arkansas Times, L.C.

phens family trusts. Jack Stephens is chairman of both Donrey and SGI.

**Community Publishers, Inc ("CPI")** publishes the *Benton County Daily Record* ("the *Daily Record* "), which also competes in the local daily newspaper market of Northwest Arkansas. CPI is owned by Jim Walton, the son of Sam Walton, founder of Wal–Mart Stores, the country's largest and most successful retailer.[2] CPI also sought to purchase the *Times* from Thomson in partnership with WEHCO Media. WEHCO Media is owned by Walter Hussman, and it publishes the *Arkansas Democrat–Gazette,* a statewide newspaper out of Little Rock. It is the only Arkansas daily newspaper with statewide circulation. The *Arkansas Democrat–Gazette* is a merger of two formerly competing statewide newspapers, the *Arkansas Democrat* and the *Arkansas Gazette,* which conducted a newspaper war to the death in the 1980's. At that time the *Gazette* was owned by Gannett, a large nationwide newspaper chain which publishes *USA Today* along with numerous other newspapers spread across the United States.

**Shearin, Inc. d/b/a Shearin & Company Realtors ("Shearin")** is a real estate brokerage firm with its principal office in Rogers and a branch office in Bentonville. It advertises regularly in both the *Morning News* and the *Daily Record.*

## II. NAT's ACQUISITION OF THE TIMES

The court will begin by outlining the events leading up to NAT's acquisition of the *Times,* because it is useful in showing the noncompetitive manner in which the Stephens family does business together and the relationship between their companies, NAT and Donrey. The acquisition history is also useful in explaining the role of Thomson in closing the deal despite the existence of substantial antitrust questions, which will be relevant to the way the court shapes its remedy.

Donrey had historically expressed interest in acquiring the *Times.*[3] In September 1994, Emmett Jones, Donrey's President and Chief Operating Officer, met with Robert Daleo, Thomson's Chief Financial Officer, at the Dallas–Fort Worth Airport. Daleo asked Jones whether Donrey would sell the *Morning News*; while Jones asked Daleo whether Thomson would sell the *Times.* Both parties were ready to buy, but neither party was willing to sell. Apparently each party wanted the operational synergies and obvious competitive advantages that would accompany owning all three daily local newspapers in Northwest Arkansas.

In November 1994, Donrey was again involved in negotiations where it sought to acquire the *Times* from Thomson. The deal involved a three-way exchange, whereby Donrey would convey a certain media property to a third party, which would then convey other media properties to Thomson, which would then convey the *Times* to Donrey. The deal fell through when the third party backed out.

In January 1995, Donrey made its final attempt to acquire the *Times.* On January 19th, Thomson publicly announced its intention to sell the *Times.* Thomson also announced its intention to sell twenty-four other United States newspapers in a package deal. Thomson did not include the *Times* in the package of twenty-four newspapers as it felt that the *Times* was more valuable and because various entities had already expressed interest in it, including Donrey and CPI. Thomson stated bids for the *Times* should be received by February 8, 1995, but Thomson reserved the right to sell the *Times* before that date.

On January 19 or 20, 1995, Jones called Daleo to get the bid package and to set up a Donrey–Thomson meeting. With regard to the purchase price, Daleo told Jones that Thomson wanted approximately fifteen times earnings or twenty million dollars for the *Times.* The twenty million dollar figure was

---

**2.** Steve Trollinger and Mike Brown own a small percentage of the stock in CPI.

**3.** Plaintiff CPI has also desired to purchase the *Times.* Steve Trollinger, the President of CPI

and the publisher of the *Daily Record,* has sent a number of letters over the years to Thomson about purchasing the *Times.*

based on in-house financial analyses performed by Thomson which assumed that the purchaser would combine the *Times* with one or more newspapers and achieve "operational synergies." [4] A much lower purchase price resulted from Thomson's "stand-alone" analysis, which projected the value of the paper as though it would be owned and operated as an independent entity. Jones, who likely presumed operational synergies for Donrey, testified that he would have valued the *Times* at between twenty and thirty million dollars.

Soon after Thomson put the *Times* up for sale, Jack Stephens and his executive assistant, Scott Ford, who is also a vice-president of Donrey, became directly involved. On January 23 and 24, 1995, there were meetings with attorneys in which they discussed legal aspects of purchasing the *Times* "a good bit," to quote the testimony of Jack Stephens. Over the course of these meetings, Jack Stephens decided that he would purchase the *Times* through NAT rather than through Donrey. However, Donrey officials were not consulted or apprised of the decision when it was made.

According to Jack Stephens, he decided on a NAT purchase of the *Times* primarily due to his interest in the Fayetteville community and his desire for a more hands-on opportunity for members of his family and high level SGI officers. He stated further that a Donrey purchase would not have accomplished this goal, because Donrey's management and operations structure was already in place when purchased by the Stephens family in August 1993. Thus, a Donrey purchase would not have allowed Stephens family members and personnel to be as involved in the daily operation of the *Times* as Jack Stephens wanted them to be.

On January 24, 1995, there was a luncheon meeting in Fort Smith, Arkansas, between Donrey's senior management personnel and several SGI representatives. Present at the meeting were Jack Stephens, his son (Warren Stephens), Ford, Jones, Darrell Loften (Donrey's Chief Financial Officer), and other Donrey personnel.

In preparation for that meeting, Jones had told Loften, to perform additional price analysis on the *Times*. However, this additional analysis was never discussed at the January 24 meeting because Ford told Jones, upon disembarking from Jack Stephens' plane, that the Stephens family was going to buy the *Times* directly and that there was no longer any need for Donrey to be involved.

Jones was disappointed and Loften surprised, as Donrey had been trying to acquire the *Times* as part of its competitive strategy for a long time. Still, due to the ownership structure of the Stephens–Donrey organization, Donrey promptly gave up pursuit of the *Times* and did not compete with NAT to acquire it.

As a general matter, the Hart–Scott–Rodino notice provisions of the antitrust law were not an infrequent topic of discussion. At the January 24 lunch in Fort Smith, Loften asked Ford if he needed any help with Hart–Scott–Rodino compliance, to which Ford said no. Jones also knew that any acquisition by Donrey would require a Hart–Scott–Rodino filing, a matter which he says he discussed with various people including Loften, Ford, Jack Stephens and others. In fact, when Jones learned that NAT was going to purchase the *Times*, he admits that the thought passed through his mind that perhaps NAT was purchasing the *Times* to avoid the need to comply with Hart–Scott–Rodino.

On January 26, 1995, Jack Stephens discussed the *Times* purchase over lunch with his sister-in-law (Bess Stephens), his nephew (W.R. Stephens, Jr.), and his niece (Elizabeth Ann Stephens Campbell). At the meeting, there was no determination of the percentages that would be owned by each family member as that would be determined later by the accountants. In general, the exact breakdown of ownership is not considered to be a matter of great importance to the Stephens family.

On January 27, 1995, Jack Stephens and Ford met with Richard Harrington, Thomson's President and Chief Executive Officer,

---

**4.** "Operational synergies" is a term used in the newspaper industry to refer to the economies of scale that can be achieved by combining func-

tions or departments, including accounting, administration, press rooms, and composing departments.

and Robert Daleo, Thomson's Chief Financial Officer, at Thomson's headquarters in Stamford, Connecticut. The meeting had been arranged at Jack Stephens' request by a friend or associate in the banking business who also did business with the Thomson chain.[5] Jack Stephens started the meeting by immediately telling Harrington that he understood that Thomson wanted 15 times cash flow—that's twenty million dollars and that he was there to pay it. Harrington asked to be excused and left with Daleo to discuss the offer. When they returned, Harrington asked for a 10% preemptive bid premium of two million dollars, to which Jack Stephens "gulped" and said "okay." The twenty million dollar figure was the one that Thomson based on operational synergies, without any adjustment for the supposed stand-alone nature of a NAT purchase. In fact, there was not any indication in the negotiations that anyone at SGI, Donrey, or Thomson, ever took account of the recognized fact that the *Times* was worth less as a stand-alone venture. The fact that the party purchasing the property was NAT rather than Donrey did not seem to make a difference.

To finance the deal, SGI paid a dividend to the various family trusts that were investing in NAT. These trusts then transferred the dividend to NAT and received NAT stock in return. Jack Stephens and Bess Stephens also provided two bridge loans to NAT totalling thirteen million dollars. The promissory notes reflecting these bridge loans were not only unsecured, but also apparently unsigned.

The sale was consummated on February 6, 1995. According to defendants, the closing was originally scheduled for February 3rd, but it was delayed until February 6th because Daleo and Harrington were out of town and because there was some trouble calculating the value of the net current assets of the *Times*.

Prior to consummating the sale, Thomson insisted that the asset purchase agreement include an indemnification provision, whereby NAT agreed to indemnify Thomson for the costs of defending any investigation, suit or proceeding in connection with any failure to comply with Hart–Scott–Rodino or any violation of the antitrust laws. The genesis of this indemnity provision was at the January 27, 1995, meeting between Harrington and Jack Stephens, when Thomson's in-house attorney, a Mr. Harris, was called into the meeting. The indemnity provision continued to be discussed and negotiated by Thomson attorney Kenneth Carson and NAT attorney Rick Massey, who exchanged various drafts of the asset purchase agreement on January 30 and February 1. Thomson's insistence on an indemnity provision was further cemented by a threatening phone call on February 2nd from Walter Hussman of WEHCO Media, in which Walter Hussman discussed the possibility of antitrust liability with a Donrey purchase. The February 5, 1995, filing of this lawsuit and the scheduling of a February 6, 1995, preliminary injunction hearing could only have reinforced Thomson's desire for such an indemnity provision.

According to Ford, the key people for Stephens had been all through the antitrust liability issue with three different law firms prior to consummating the sale, and they were convinced that competitor plaintiffs such as CPI, Walter Hussman and Jim Walton had no standing to bring such a lawsuit. Ford did not indicate whether the lawyers discussed the possibility of a government antitrust suit and the possible need to win the case on its merits rather than on standing.

## III. SECTION 7 OF THE CLAYTON ACT

Section 7 forbids a stock or asset acquisition if it may substantially lessen competition in the relevant market. 15 U.S.C. § 18. Thus, the first step in Section 7 analysis is the definition of the relevant market. The burden of defining the market rests with the plaintiff. *H.J., Inc. v. Internat'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1537 (8th Cir.1989) (Section 2 of the Sherman Act) (citations

---

**5.** This clearly more effective way of doing business contrasted with the manner in which other prospective bidders were required to negotiate and bid. They were relegated to dealing through and with a Thomson employee much further down the chain-of-command than the CEO. That is also the manner in which the CPI–WEHCO unsuccessful bid was made.

omitted).[6] Once the relevant market is established, plaintiff must then show that the acquisition may substantially lessen competition. *Id.*

The court also notes that in order to have standing to bring this suit, private plaintiffs must demonstrate what is called antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Antitrust injury is a technical concept that requires knowledge of economics and the functioning of the relevant market. Therefore, the court will discuss it after setting forth the nature of the relevant market, although antitrust injury is a *prerequisite* to bringing a private suit.

## IV. GENERAL PRINCIPLES OF MARKET DEFINITION

The Supreme Court has stated that products belong in the same market when they are "reasonably interchangeable" for the same uses and thus exhibit a high "cross-elasticity of demand." [7] As the Eighth Circuit more simply put it, "[d]efining a relevant product market is primarily 'a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" *General Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 805 (8th Cir. 1987) *quoting SmithKline Corp. v. Eli Lilly*

& Co., 575 F.2d 1056, 1063 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

To say that two products are in the same market means that they constrain each other's ability to exercise market power by raising prices and lowering quality for fear that consumers will switch to the competitor's product.[8] It is a primary purpose of Section 7 of the Clayton Act to preserve this constraining effect on the exercise of market power. Merger Guidelines § 0.1. *See also, United States v. Archer–Daniels–Midland Co.,* 866 F.2d 242, 246 (8th Cir.1988) ("The lawfulness of an acquisition turns on the purchaser's potential for creating, enhancing, or facilitating the exercise of market power— the ability of one or more firms to raise prices above competitive levels for a significant period of time.") (citation omitted), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989); Merger Guidelines § 0.1 ("the unifying theme ... is that mergers should not be permitted to create or enhance market power or to facilitate its exercise").

In evaluating reasonable substitutability and measuring cross-elasticity of demand, the case law states that it is appropriate to consider a wide range of evidentiary sources.

[The boundaries of an antitrust market] may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate

---

**6.** In setting forth the standards that govern market definition, the court will utilize case law and the 1992 horizontal merger enforcement guidelines ("Merger Guidelines") issued jointly by the two agencies with antitrust enforcement authority, the Justice Department and the Federal Trade Commission. 4 Trade Reg.Rep. (CCH) ¶ 13,104. It is well-recognized that the Merger Guidelines do not have the force of law, *see e.g. Olin Corp. v. FTC,* 986 F.2d 1295, 1300 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994), but many courts still cite them, and the expert testimony in this case shows that they represent mainstream economic thinking.

**7.** Cross-elasticity of demand refers to "whether consumers will shift from one product to the other in response to changes in their relative costs." *SuperTurf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1278 (8th Cir.1981) (citations omitted). When products have "high" cross-elasticity, it means that small changes in the price or

quality of one product has dramatic effects on the sales of the other. When products have "low" cross-elasticity, it means that price and quality changes in one product causes little or no change in the sales of the other.

**8.** There can be no doubt as a matter of case law, the Merger Guidelines, and economic theory, that market constraints work not only to limit one's ability to raise prices above a competitive level, but also to limit one's ability to reduce quality or service below competitive levels. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 368–69, 83 S.Ct. 1715, 1744–45, 10 L.Ed.2d 915 (1963) (recognizing that competition can exist at many levels other than price); Merger Guidelines § 0.1, n. 6 ("Sellers with market power also may lessen competition on dimensions other than price, such as product quality, service, or innovation."); *Id.* § 1.11 (agency will consider buyer and seller "response to relative changes in price or other competitive variables") (emphasis added).

economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (footnote omitted). The Eighth Circuit simply treats the "practical indicia" identified by *Brown Shoe* as types of evidence that establish a relevant market for antitrust purposes.

> The "practical indicia" identified in *Brown Shoe* have been described as "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir. 1986).

*H.J., Inc.,* 867 F.2d at 1540.[9]

In the same vein, the Merger Guidelines state that the following evidence may be considered in defining the product market and evaluating cross-elasticity of demand and substitutability.

> In considering the likely reaction of buyers to a price increase, the Agency will take into account **all relevant evidence,** including, **but not limited to,** the following:
>
> (1) evidence that buyers have shifted or have considered shifting purchases between products in response to relative changes in price **or other competitive variables;**
>
> (2) evidence that sellers base **business decisions** on the prospect of buyer substitution between products in response to

relative changes in price **or other competitive variables.**

Merger Guidelines § 1.11. (emphasis added). The Merger Guidelines also note that evidence "may be derived from the documents and statements of both the merging firms and other sources." Merger Guidelines § 0.1.

Upon evaluating the evidence, the cases do not specify numerically how "high" the cross-elasticity of demand between two products must be before they can be included in the same market for antitrust purposes. In any case, it is usually impossible to reliably quantify cross-elasticity of demand, which is why the Supreme Court allows reliance on "practical indicia." *See e.g. U.S. Anchor Mfg. v. Rule Indus.,* 7 F.3d 986, 995 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994).

In a typically vague statement of the cross-elasticity threshold, the Eighth Circuit states that "the cross-elasticity of demand must be sufficiently high to statistically reflect consumers' perception that the two products are reasonably interchangeable." *Archer–Daniels,* 866 F.2d at 248. Under the Merger Guidelines, two products are in the same market if the seller of one product is constrained by the presence of the other, and thus, cannot profitably impose a "small but significant and nontransitory" increase in price without fear of significant consumer switching to a competing product.[10] Merger Guidelines § 1.0. *Cf. Archer–Daniels,* 866 F.2d at 248 n. 1 (cross-elasticity to be measured with regard to "slight" price increases).

---

**9.** In *Brown Shoe,* the practical indicia were meant to define a so-called "submarket," which is to be contrasted with the "broad product market." But the emerging consensus of antitrust scholars and case law seems to be that the term "submarket" is unnecessary. Whether you call it a submarket or a broad product market, it is still the relevant market for antitrust purposes and must be marked by reasonable interchangeability and cross-elasticity of demand.

One approach, adopted by the Eighth Circuit, and described above, would simply do away with the term "submarket" and treat the "practical indicia" of *Brown Shoe* as types of evidence that establish the relevant market, whether it be a submarket or a broad product market. *H.J., Inc.*

*v. Internat'l Tel. & Tel. Corp.,* 867 F.2d 1531, 1540 (8th Cir.1989) ("the same proof which establishes the existence of a relevant product market also shows (or . . . fails to show) the existence of a product submarket") (citing Areeda & Hovenkamp, Antitrust Law ¶ 518.1 at 311–15 (1987 Supp.)); *accord* IIa Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law ¶ 533a–g (1995).

**10.** A slight increase is usually referred to as five or ten percent. All parties to the suit use the five to ten percent figure, but it should be noted that this figure does not appear in the Merger Guidelines.

With regard to defining the geographic market, the same basic principles apply, and the court need not discuss them in detail. Also, the geographic market is not a significant issue in this case. Determination of the product market will for all intents and purposes determine the geographic market, because the relevant product market consists of *local* daily newspapers. Thus, the product market has a built-in geographic component. If two daily newspapers are considered local by the consumers, then they belong in the same geographic market. Defendants' own expert, Thomas Overstreet, testified that if the *Times* and the *Morning News* are in the same product market, then "as a matter of logic," they are in the same geographic market.

## V. THE RELEVANT MARKET: LOCAL DAILY NEWSPAPERS

■■■ In this case, the relevant product market for antitrust purposes is the local daily newspaper. This market is in fact two markets: one for readers and one for advertisers. As the Supreme Court stated in *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 610, 73 S.Ct. 872, 881, 97 L.Ed. 1277 (1953), "every newspaper is a dual trader in separate though interdependent markets; it sells the paper's news and advertising content to its readers; in effect that readership is in turn sold to the buyers of advertising space." Each market will be analyzed in turn.

### a. The Readership Market

The court will begin by describing, in a qualitative manner, the peculiar characteristics and uses of the daily newspaper. The court will then contrast these with the uses and characteristics of the most likely candidates for inclusion in the product market: television, radio, national and state newspapers, shoppers, and weekly newspapers.

The local daily newspaper provides a unique package of information to its readers. Foremost, it provides national, state and local news. Many of the stories, such as those on high school sports and city council meetings, are of purely local interest. Readers also value other features of a local nature,

including calendars of local events and meetings, movie and TV listings, classified advertisements, other local advertising, legal notices, and obituaries. The format of the newspaper allows its message to be timely and detailed. Moreover, a newspaper is portable and allows readers access to information at their own convenience.

The peculiar characteristics and uses of other media outlets are completely different. National and state newspapers have a similar format to local papers, but they contain no local news or advertising, which is a critical factor in the acceptance and success of a local daily. For instance, even though the *Democrat–Gazette* and the *Tulsa World* are quality papers, they have limited circulation in Northwest Arkansas. On the other hand, weekly papers offer purely local news, and as weeklies, they offer virtually no time sensitivity. Radio news and television news are also poor substitutes for local papers. Television and radio are primarily dedicated to entertainment, and to the extent that they offer news and information, they lack breadth and depth of coverage. Also, they are not portable and convenient like newspapers.

As for the perspective of the industry, it is clear that it sees local daily newspapers as a separate product from other media. Industry people gave direct testimony excluding various media outlets from the market occupied by local dailies. More compelling, however, were the contemporaneous, prelitigation records of the various newspaper organizations and personnel involved in the case. For instance, George Smith, Publisher of the *Times*, made frequent comparisons between the *Times* and the *Morning News;* but he did not make comparisons between the *Times* and any other media outlet. By negative inference, Smith, Thomson, and the other industry people involved in this case did not perceive local daily newspapers to be in close competition with media outlets other than local daily newspapers.

As for expert opinion, the two experts with the most experience in newspaper economics testified that a market limited to local daily newspapers was the proper one. One was the expert for the private plaintiffs, Robert Picard, a communications Ph.D. who may be

one of the foremost experts on newspaper economics in the country. He has, among other things, published and edited numerous books and articles on the subject and has testified before the legislatures of various countries. The other expert, Kenneth Baseman, testified for the government. Baseman is an economist who has spent many years doing antitrust work for the government and private parties, including a stint at the antitrust division where he worked extensively on the agency's challenge to the joint operating agreement between the *Detroit Free Press* and the *Detroit News*. Even defendants' own expert, Thomas Overstreet, limited the market to local daily newspapers. As such, defendants should not be heard to complain that the government and private plaintiffs have failed to carry their burden of proof in excluding other media from the relevant market.[11]

### b. The Advertising Market

The local daily newspaper offers advertisers a unique set of opportunities. They are able to reach a broad cross-section of consumers in a specific geographic circulation. They also allow a detailed message to be delivered in a timely manner.

The peculiar characteristics and uses of other advertising media are very different. National and state newspapers do not carry any local advertising. Given the limited circulation of such papers in Northwest Arkansas, and their high per reader advertising cost, local and regional advertisers do not see them as substitutes for local daily newspapers. As for weekly newspapers, the main problems are that advertising messages are not delivered in a timely manner and that weeklies do not reach the number of readers that dailies do. With regard to "shoppers," they do not provide the high quality demographics that newspapers provide. They also do not meet the needs of advertisers who wish to convey an elite product message. They are also not timely.

As for radio and television, the main problem with such media is that the advertising message conveyed is transitory. It is nearly impossible to provide price detail, and so newspapers are especially critical for grocery stores, department stores, furniture outlets, hardware stores, car dealers, etc. Television and radio do not provide a guaranteed audience and the expense of producing radio and television spots can be prohibitive. Many advertisers use radio and television to complement, but not replace, their use of print advertising, often for the purpose of "image advertising." As for circulars and direct mail, these are often considered nuisances and junk mail and are often thrown away.

While businesses do divide their advertising budget among various advertising media, the portion of the so-called "media mix" that is dedicated to any one particular media, such as local daily newspapers, tends to stay fixed over time. As a result, local daily newspapers compete against each other, not the other media, which are not reasonably interchangeable for the same purposes.

This view of advertising competition is accepted by industry personnel, advertising consultants, newspaper economics experts and the advertisers themselves. Also, in making decisions, including pricing decisions, the contemporaneous, prelitigation records of the various newspaper organizations and personnel involved in the case show a complete lack of interest in other advertising media, but a great deal of concern with other local daily newspapers, which by negative inference shows that other media are not part of the market.

### c. Case precedent on newspaper markets

The weight of case authority confirms the court's almost intuitively correct definition of the market. *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (Sections 1 and 2 of the Sherman Act); *Paschall v. Kansas City Star Co.*, 695 F.2d 322 (8th Cir.1982), *different results reached on reh'g*, 727 F.2d 692

---

11. Defendants argue that there is no proof "that the Court should exclude local television, radio, weekly newspapers, etc., from the relevant market for readers." As the government notes, it is curious for defendants to suggest that television and radio are in "the relevant market for **readers**."

(8th Cir.1984), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984) (Section 2 of the Sherman Act); *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383 (8th Cir.1974), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974) (Section 2 of the Sherman Act); *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.* 441 F.Supp. 628 (W.D.N.Y.1977), *rev'd on other grounds*, 601 F.2d 48 (2nd Cir.1979) (Section 2 of the Sherman Act); *United States v. Citizen Publishing Co.*, 280 F.Supp. 978 (D.Ariz.1968), aff'd, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (Section 7 of the Clayton Act); *United States v. Times Mirror Co.*, 274 F.Supp. 606 (C.D.Cal.1967), *aff'd*, 390 U.S. 712, 88 S.Ct. 1411, 20 L.Ed.2d 252 (1968) (Section 7 of the Clayton Act).

Although this court has made its own findings of fact, it believes that the vast weight of authority and the method of analysis utilized in the cited cases supports the market definition in this case. In *Bowen v. New York News, Inc.*, 366 F.Supp. 651, 675 n. 56 (S.D.N.Y.1973), *aff'd in part and rev'd in part*, 522 F.2d 1242 (2d Cir.1975) *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976), the court did not find it necessary to make its own findings of fact, since "[i]t is now well settled that the daily newspaper is a distinct line of commerce." But in *Knutson v. Daily Review, Inc.*, 383 F.Supp. 1346 (N.D.Cal.1974), *aff'd in part and rev'd in part*, 548 F.2d 795 (9th Cir.1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), the court expressly rejected *Bowen's* approach on the grounds that determination of the relevant market is a factual, not a legal, determination. Although *Knutson* is probably correct, the court notes that, in the future, it would probably make little sense for any party to relitigate this issue, given the amount of resources spent on an issue that has been resolved the same way by every court that has addressed it in any depth.

## VI. THE NORTHWEST ARKANSAS NEWSPAPER MARKET

The court has discussed why the local daily newspaper is a separate product as a general matter. This still leaves the critical question of which daily newspapers are considered "local" by readers and advertisers in Northwest Arkansas.

Perhaps, it is appropriate to define what the court means when it speaks of "Northwest Arkansas." When one familiar with this area speaks of "Northwest Arkansas" it is not intended to merely describe a geographic location. Instead, that term has come to denote an increasingly integrated economic, social and political unit which just happens to be located in the northwest corner of the state.

It is generally considered that "Northwest Arkansas" encompasses Washington and Benton Counties, and is an area that is not only blessed with beautiful Ozark mountain countryside, but also progressive and aggressive people with an outstanding work ethic. It is this area of the country where, among other things, the nation's top poultry producer and one of its top food companies had its genesis and is located, and where Sam Walton started, barely 30 years ago, what became the nation's top retailer and second largest private employer. The area is also the home of the University of Arkansas which exerts a tremendous economic and cultural influence on the area.

There are numerous successful businesses in the area which provide jobs to a great number of employees. In recent years, the area has become increasingly multi-cultural and multi-lingual because of the influx of large numbers of Mexican nationals who have come to the area to take advantage of the extremely low unemployment rate in the area which regularly runs less than 3%, even in times when other areas of the country are experiencing high unemployment.

The major cities in the two county area are Fayetteville, Springdale, Rogers, and Bentonville. Tremendous population increases over the last several years have resulted in the two-county area having a population, according to evidence at the trial, of an excess of 233,000 people, a large of portion of whom live in one of the cities listed above. Until the last few years, these cities were not only separate political entities, but separate and highly parochial social units. Now, with the increase in population, those cities have

"grown together" and only imaginary boundary lines separate them. As one drives across the area, it is impossible for even natives in most cases to determine when they leave one of the towns and enter the next.

Not only has the area "grown together" geographically and in respect to population, it has also increasingly become one economic and social unit. The area is presently engaged in the building of a large regional airport, and there are other examples of the citizens of the entire area working together for a common goal. Without exception, the "experts" who testified lauded the outstanding economic climate present in the entire area, and predicted a bright future.

In short, it was not too many years ago that Fayetteville, Springdale, Rogers, and Bentonville were distinct and separate towns with distinct and separate citizens that viewed themselves as such. That has changed and is changing. That fact has been evidenced graphically by recent changes in the newspaper industry in the area. Until recently, each of the towns had "their own newspaper" but, in November 1994, Donrey Media, the common owner of the *Springdale Morning News* and the *Northwest Arkansas Morning News* based in Rogers, merged the papers, and named the combined newspaper *The Morning News of Northwest Arkansas*. That newspaper intends to be and has advertised itself to be the paper for all of Northwest Arkansas, a recognition that the area has become or is fast becoming a cohesive economic, social and cultural area.

■ The court will conclude that the *Times* and the *Morning News* strongly compete against each other for readers and advertisers in Washington County. The court will also conclude that the *Daily Record* and the *Morning News* compete against each other in Benton County. Finally, although the *Times* and the *Daily Record* do not currently appear to compete for readers and compete only weakly for advertisers, this court will conclude that they belong in the same market as well—the Northwest Arkansas market.

## a. Readership competition between the *Times* and the *Morning News*

The record is absolutely replete with evidence that the *Morning News* and the *Times* compete in the same product market and that they both serve the same locale. Specifically, they are competing for readers in the Washington County area which is comprised mainly of the towns of Fayetteville and Springdale.

Both papers offer products with very similar characteristics. Both papers cover news of regional interest such as the proposed regional airport now under construction, the University of Arkansas, Washington County government and courts, meetings of the governing bodies of the area's major hospitals, the federal courts, Fayetteville and Springdale city council meetings, and high school sports, and provide classifieds and local merchant advertising.

The *Morning News* has offices with customer service and editorial staffs in both Fayetteville and Springdale, the locations of which are listed in two separate parts of the paper every day. In its Fayetteville office, the *Morning News* has four reporters who cover county government, county court, federal court, the University of Arkansas, and city affairs. Tom Stallbaumer, the publisher of the *Morning News*, does not feel that his paper yet matches the *Times* in its coverage of Fayetteville, but he admits that his paper aspires to do so. As for the *Times*, it also provides extensive coverage of newsworthy events in Fayetteville, and, to a somewhat lesser extent, in Springdale and Benton County. It is currently engaged in a news-sharing agreement with the *Daily Record*, so that the *Times* may better cover Benton County and better compete with the coverage of the *Morning News*.

Not surprisingly, there is substantial circulation overlap, with the *Times* reaching 2,184 readers in Springdale and the *Morning News* reaching 4,424 daily readers and 4,821 Sunday readers in Fayetteville. In fact, with a switch of approximately 1,800 readers, the *Morning News* would overtake the *Times* as the circulation leader in Fayetteville. Currently, the *Morning News* and *Times* both sample readers, telemarket, have sales racks

and home delivery routes throughout Washington County.

The numerous business documents in this case also constitute a detailed contemporaneous record of the competitive actions and reactions that the papers have undertaken in direct response to each other. For instance, the *Times* was, until the last few years, an afternoon paper until the *Springdale Morning News* switched to a morning paper and made significant circulation gains in Fayetteville, at which point the *Times* became a morning paper.

At one time, the *Morning News* did not publish on certain holidays, on which days the *Times* would sample (throw free papers) the readers of the *Morning News* along with a flyer that remarked on the *Morning News* not being an every day paper. The *Morning News* now publishes 365 days a year.

Both papers exhibit an ongoing concern over who scoops whom which is largely motivated by circulation concerns. At one point, the *Morning News* reviewed its staff assignments and improved its police coverage because it was an area where the *Times* sometimes prevailed. Competition over local sports coverage was particularly intense, with the *Times* and the *Morning News* engaged in a public back and forth battle over the number of reporters covering events, the number of photos and stories, and the extent of coverage, including women's volleyball and soccer.

The *Times* began using color so that it could compete more effectively, and the *Morning News* responded in kind. The two papers also compete for readers by producing features and special interest sections. In one case, the *Morning News* began a travel page soon after the *Times* started one. These are the equivalent of competitive responses to what the Merger Guidelines call "small but significant and nontransitory" increases in price or decreases in quality.

In addition to these concrete actions and reactions, the internal memoranda of the *Times* and the *Morning News* show a consis-tent obsession with each other as "the competition." These are too numerable to discuss further.

**b. Advertiser Competition between the *Times* and the *Morning News***

In this case, there is only a small amount of evidence that the two local daily newspapers compete "directly" for advertisers. That is, no advertiser decides he will advertise either in the *Times* or in the *Morning News*, depending on who offers the better deal. Even the government's own expert, Kenneth Baseman, did not find any evidence of this sort of competition.[12] The primary reason that such direct competition is absent is that no regional advertiser who has customers throughout Northwest Arkansas, such as a car dealer, can reach all of Washington County without using both newspapers. Also, no purely local advertiser, such as a grocery store, can reach the majority of reader households in Fayetteville without using the *Times* or reach the majority of households in Springdale without using the *Morning News*.

Still, there is a great deal of evidence that these two papers compete "indirectly" for advertisers by means of what was called by some of the witnesses a "negative feedback loop," for want of a better term. The competition, although "indirect," is effective and pervasive. The "negative feedback loop" begins with the premise that local advertising is a critical part of what sells a local newspaper, just like the coverage of local sports or any other local news event. Apparently, many people buy newspapers to have access to advertisements and advertiser's promotions which they provide. If a paper is deficient in local advertising it will eventually lose readers. A loss of advertising revenue will also lead to a decline in the paper's ability to maintain its quality, which will also lead to a loss of readership. With the loss of readers, the paper will lose more advertisers, and then more readers, and so on until its demise. This is a "negative feedback loop."

12. However, the government did present solid evidence that the two papers competed directly for legal advertising on at least one occasion.

Therefore, both the *Morning News* and the *Times* have an incentive to keep the price of advertising low enough so that advertisers do not drop their ads, decrease their size, or decrease their frequency. Of course, this incentive would exist even in the absence of a competitive market, but the existence of a competitor means that a decline in advertising content due to high rates is much more likely to lead to a loss in readership to the competing paper. The loss of readership will then result in a further loss of advertising, and the negative feedback loop, which is often irreversible, has begun.

Another way in which competition exists between the *Times* and the *Morning News* is through the process of "benchmarking," whereby local advertisers compare the relative advertising value provided by each paper. Thus, the papers try to provide equal value to some extent, since neither paper wants to lose the good will and business of their advertisers by looking like a "rip off" in comparison to the other. The dynamic of benchmarking can exist between products that are not in the same market, but the high degree of benchmarking that clearly exists in this market results from the close competitive relationship between the *Times* and the *Morning News*, which is so universally recognized in the local community.

There is one final avenue of advertising competition with respect to regional advertisers that merits discussion. While no regional advertisers can completely forego advertising in either the *Times* or the *Morning News*, they can place more of their limited advertising budget into the one newspaper that they feel gives them the better value.

Thus, in 1992, the *Times* was very concerned about losing regional advertisers because its prices were not competitive with the Springdale/Rogers combo buy.[13] The *Times* also displayed a continuous concern over losing automobile advertising, and even offered a lower auto rate in 1994 to try to entice dealers to use the *Times* rather than the *Morning News*. George Smith, the publisher of the *Times*, expressed concern to a fellow publisher that he had to win back his "rightful share" of advertising from one particular regional dealer, Lewis Auto. The owner of Lewis Auto, Tom Lewis, testified that he felt his dealership had benefitted from the advertising competition between the two papers.

Although the dynamics just described are somewhat theoretical, they do not strike the court as being particularly controversial, at least not from the testimony provided by those familiar with the industry. Moreover, these theories explain the high degree of time and energy that the *Times* and the *Morning News* put into monitoring and responding to the advertising efforts of each other. For instance, the *Times* was concerned that it got less Springdale ads than the *Morning News* got Fayetteville ads. The *Times* routinely compared its advertising rates and revenue with those of the *Morning News*. The *Morning News* also monitored the number of national ads that the *Times* received to make sure it did not get "scooped" on any national ads.

In 1993, when the *Times* learned that a Donrey paper in Fort Smith, Arkansas, was offering a coupon book of volume discounts for advertisers, it offered its own version in anticipation that the *Morning News* would follow suit. Two weeks later, when the *Times* perceived that advertisers preferred the coupons offered by the *Morning News*, it redesigned its own.

In 1992, the *Times* had its advertising staff contact local businesses that had placed ads in the *Morning News* to offer them a special "pick-up" rate to run the same ad in the *Times*. In 1994, the *Times* considered using the same strategy with regard to classified ads run in the *Morning News*.

If the "negative feedback loop," "benchmarking," and "rightful share" theories do not explain the above competitive conduct, then the alternative explanation would be that the *Times* and the *Morning News* were completely deluded about being in competition for advertising and that the efforts spent

---

**13.** Prior to November 1994, the *Morning News* was actually two newspapers: the *Northwest Arkansas Morning News* based in Rogers and the *Springdale Morning News* based in Springdale. Both were owned by Donrey, which merged them.

monitoring this nonexistent competition were the futile and inefficient gestures of ignorant businessmen who did not even know their own market. The court considers this alternative unacceptable. Thus, the court is convinced that the two newspapers do compete for advertising even though it may be difficult to quantify the competition statistically.

## c. Numerical measurement of cross-elasticity of demand

In the face of this evidence, defendants contend that they decisively proved there is no cross-elasticity of demand between the *Times* and the *Morning News,* and therefore, the products do not belong in the same market. They supposedly prove their point by having their expert, Thomas Overstreet, measure the amount of switching from one paper to another when one paper increases its rack prices or subscription rates. As the amount of the price increase was greater than five to ten percent, and as the degree of switching caused by the increase did not render the increase unprofitable, defendants conclude that there is no cross-elasticity of demand under the Merger Guidelines.

While defendants correctly contend that courts do not usually allow the government to take positions that are inconsistent with the Merger Guidelines, the court does not believe the government has done so in this case. Steven A. Newborn & Virginia L. Snider, *The Growing Judicial Acceptance of the Merger Guidelines,* 60 Antitrust L.J. 849, 852 (1992). As explained above, the court believes that the approaches to market definition endorsed by the Merger Guidelines and the case law are essentially consistent.[14] This approach acknowledges that cross-elasticity of demand is nearly impossible to measure numerically in all cases and relies on a broad array of evidence and "practical indicia" to establish cross-elasticity. *See e.g. U.S. Anchor Mfg. v. Rule Indus.,* 7 F.3d 986, 995 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). The 1984 Merger Guidelines made the same

point when they explained that the 5–10% test "is an analytical tool with which to analyze traditional types of probative evidence." 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,552 (June 14, 1984). That is, the 5–10% test is not a rigid requirement that cross-elasticity be measured numerically.

Analyzing the independent probative value of Dr. Overstreet's calculation of the relationship, or the lack thereof, between price and consumer switching, the court concludes that this calculation fails to controvert the overwhelming evidence that cross-elasticity of demand exists. *United States v. Continental Can Co.,* 378 U.S. 441, 455, 84 S.Ct. 1738, 1746, 12 L.Ed.2d 953 (1964) ("that the demand for one [product] is not particularly or immediately responsive to changes in the price of the other are relevant matters but not determinative of the product market issue"). Dr. Overstreet's approach was to attempt to apply the Merger Guidelines with blinders on which were designed to prevent him from seeing anything other than the reaction of the market to a slight price increase—if that didn't show a shift in customers, then there was simply no competition present. His calculation only applied that part of the Merger Guidelines, and he failed, refused or neglected to control for all sorts of other important variables.

He failed to measure or even consider the loss of advertising profits that will be caused by the loss of readership. He failed to measure the fact that price increases were offset by quality increases. He failed to take into account the expert testimony that price, as long as it is in the range one expects to pay for newspapers, is an almost insignificant factor in one's choice of newspaper. *See Times Mirror,* 274 F.Supp. at 615 (placing newspapers in same market although "differences between the price raises of the Times and the Sun did not produce a significant change in circulation") (*citing Continental Can, supra*). Also, defendants' expert has no special experience in the newspaper in-

14. It is obviously good public policy that the guidelines be interpreted as consistently as possible with the case law which is binding. Steven A. Newborn & Virginia L. Snider, *The Growing Judicial Acceptance of the Merger Guidelines,* 60

Antitrust L.J. 849, 851 (1992) ("if the Guidelines and the bench diverge, merger law would be forced into a morass of nonmerger analysis—a possibility as attractive as becoming involved in a land war in Asia").

dustry or in Northwest Arkansas. The court could just as easily have performed Dr. Overstreet's simplistic calculations.

During questioning by the court, Dr. Overstreet seemed to agree that if his approach had been used in the famous and infamous, in Arkansas at least, *Democrat vs. Gazette* newspaper war that destroyed the then Gannett owned *Gazette* which advertised that it was the oldest newspaper west of the Mississippi, it would have shown that these newspapers were not competitors, at least until some point shortly before the *Gazette* was forced out of business. That was true because, until that time each paper had a loyal group of readers and advertisers who wouldn't switch until the *Democrat* succeeded in driving the *Gazette* out of business. He seemed to agree with the court's statement that, like the bumblebee that can't fly, Walter Hussman didn't know that he wasn't a competitor so he kept competing until he was competing—and won.

Finally, defendants' theory leaves unexplained why everyone involved with these newspapers thought they were competing and made numerous business decisions and took innumerable competitive actions as if they were.

### d. Competition between the *Daily Record* and the *Morning News*

Much of the evidence that indicates active competition between the *Times* and the *Morning News* in Washington County shows the same active competition, perhaps to a slightly lesser degree, between the *Daily Record* and the *Morning News* in Benton County. The *Daily Record's* daily circulation in Benton County is 9,696; while the *Morning News* has daily circulation in Benton County of 17,350. In the interest of brevity, the court will not detail the remaining evidence.

### e. The *Times* and the *Daily Record* belong in the same market

The evidence clearly shows strong competition for readers and advertisers in Washington County between the *Times* and the *Morning News*, and also between the *Daily Record* and the *Morning News* in Benton

County. However, this leaves the question of whether the *Times* and the *Daily Record* belong in the same market given the fact that they have scarce competition for readership and only limited competition for advertisers, as even Dr. Picard, private plaintiffs' own expert, recognized. Still, the court concludes that the *Times* and the *Daily Record* belong in the Northwest Arkansas daily newspaper market, along with the *Morning News*.

It may seem strange that the *Times* and the *Daily Record* are in the same market even though they do not vigorously compete, but the fact remains that, as a practical matter, the common ownership of the *Times* and the *Morning News* would greatly affect competitive forces over the entire two-county area. It must be remembered that the purpose of Section 7 of the Clayton Act is to prevent the undue aggregation of market power. Market definition is merely a tool in that quest, not the goal.

> It is initially important to keep in mind that "[m]arket definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether market power exists." L. Sullivan, *Antitrust* 41 (1977).

*General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987); Merger Guidelines § 0.2.

Equally important, "[t]he determination [of a relevant market] is essentially one of fact, turning on the unique market situation of each case." *H.J., Inc. v. International Telephone & Telegraph Corp.*, 867 F.2d 1531, 1537 (8th Cir.1989). (citations omitted). The notion that market definition is a pragmatic, factual exercise is a theme that runs throughout the cases. *See e.g. Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467, 112 S.Ct. 2072, 2082, 119 L.Ed.2d 265 (1992) ("In determining the existence of market power ..., this Court has examined closely the economic reality of the market at issue."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962) (courts should take a "pragmatic, factual approach to the definition

of the relevant market and not a formal, legalistic one" so that the definition of the relevant market will " 'correspond to the commercial realities' of the industry and be economically significant") (citations omitted); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987) ("In defining the relevant part of commerce for any product, the reality of the marketplace must serve as the lodestar") (citation omitted). Similarly, the Merger Guidelines provide that since "it is not possible to remove the exercise of judgment from the evaluation of mergers ... the Agency will apply the standards of the Merger Guidelines reasonably and flexibly to the particular facts and circumstances of each proposed merger." Merger Guidelines § 0.

The fact is that this acquisition would affect market power over the entire two-county area. As will be explained, it would effect the viability of the *Daily Record*. It would alter pricing and strategy decisions over the two-county area. It would deter one potential competitor from entering the market. These are practical realities involving market power and competition, no matter how one characterizes the current relationship between the *Times* and the *Daily Record*. It makes no sense to say, as a matter of law, that the market does not include both counties.

The court begins with the indisputable fact that Northwest Arkansas is increasingly integrated—socially, politically and economically. More than any other product market, a local daily newspaper market reflects the underlying socioeconomic base of its geographic market. For this reason, the traditional indices of a newspaper market include the Metropolitan Statistical Area (MSA), Audit Bureau of Circulations Retail Trading Zone, County, ABC City Zone, and Newspaper Designated Market Area. MSA's, which are officially designated by the U.S. Office of Management and Budget, are economic and social regions in which a nucleus city or cities and adjacent communities have achieved a significant degree of economic and social integration. ABC Retail Trading Zones, which are determined jointly by local newspapers and by the Audit Bureau of Circulations, are

the area over which businesses in the local commercial center draw customers from outlying areas. County lines are politically defined and only sometimes useful in defining the newspaper market. ABC City Zones, which are done by the Audit Bureau of Circulations, include the central portion of a city and its contiguous suburbs. Finally, the Newspaper Market Designated Area is the geographic market area defined by a newspaper when its market does not correspond to any of the traditional measures. It is defined as the primary commercial and residential region in which the newspaper operates.

These measures may be more or less useful in a particular case, depending on the circumstances of the market. The court does not exclusively rely on any one of them. They are listed simply to make the point that the local daily newspaper market tends to reflect the underlying social, economic and political development of the locale. As such, it makes a great deal of sense to refer to a Northwest Arkansas market. Moreover, the fact is undisputed that the social, economic and political integration of the Northwest Arkansas region will continue apace. *United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974), quoting, *Brown Shoe*, 370 U.S. at 322 n. 38, 82 S.Ct. at 1522 n. 38 ("only a further examination of the particular market—its structure, history *and probable future*—can provide the appropriate setting for judging the probable anticompetitive effect of the merger") (emphasis supplied).

The court now turns to the fact that every newspaper company involved in Northwest Arkansas viewed the local daily newspaper market as consisting of Washington and Benton Counties. Donrey and the *Morning News* clearly viewed the market that way and developed a product that vigorously competed for readership in every town in the two-county area. As is clear from the paper's own masthead, it is the *Morning News* of *Northwest Arkansas*.

The same goes for the *Northwest Arkansas Times*. Thomson viewed the two-county area as a single market that could be dominated by a single paper, which was its stated goal. To achieve that goal, Thomson consid-

ered purchasing the *Morning News* and the *Daily Record.* It also conceived a six month program to extend its circulation in Rogers, Arkansas, in Benton County. The plan was abandoned after a few weeks due to a lack of success, but a failure to succeed at competing does not mean that competition does not exist.

CPI also recognizes that the *Daily Record* operates in a two-county market, although its main circulation appeal is in Benton County, as reflected by its masthead, the *Benton County Daily Record.* CPI realized it operated in a two-county market and thus also coveted acquiring a second paper in that market, *i.e.,* the *Times.*

Finally, WEHCO and the *Arkansas Democrat–Gazette,* the state-wide paper published in Little Rock, is strongly considering a zoned edition of the paper for twelve counties in Northwest Arkansas aimed primarily at the two-county market encompassed by Washington and Benton Counties. WEHCO clearly conceives of the market as primarily a two-county market, and has spent a great deal of time and money laying the groundwork for a possible zoned edition. The undisputed testimony is that, if NAT's purchase of the *Times* is allowed to stand, WEHCO is much more unlikely to enter the market.

In addition to the clear views of the market participants, the nature of the readership market is such that a local daily paper can be targeted to a single county (the *Daily Record*) or to both counties (the *Morning News*), but the success of all three remaining local newspapers will be affected by their ability to provide regional coverage that satisfies the regional interests of a regional audience, no matter what section of that audience is targeted. In recognition of this fact, the *Times* and the *Daily Record* have a news and advertising sharing agreement, whereby the *Times* provides the *Daily Record* with Washington County news and advertising, and the *Daily Record* does the same for the *Times* with Benton County.

This similarity of product is extremely important in defining the market, and thus the *Times* and the *Daily Record* should both be included in the product market because both papers are poised to become truly regional papers. Thus, there is a great deal of so-called "cross-elasticity of supply" among local daily newspapers in Northwest Arkansas. High cross-elasticity of supply exists when existing companies have the ability to alter their facilities to produce the defendant's product in response to monopolistic price increases or quality reductions. 3 Julian O. von Kalinowski, *Antitrust Laws & Trade Regulation* § 18.02[1](c) (1994). Using cross-elasticity of supply to enlarge the product market is accepted by the courts, the Department of Justice, the Federal Trade Commission, and economists generally. *Id.* at n. 59.

In this case, all three local daily papers are poised to become increasingly regional should the competition falter, and so long as the market does not become too concentrated. *See also Jim Walter Corp. v. Federal Trade Comm'n,* 625 F.2d 676, 682–83 (5th Cir.1980) (geographic market can be expanded to include regions that do not currently have sales in each other's area, if "regional markets are so interrelated that what happens in one has a direct effect in the others and none is so separate that the buyers and sellers are not concerned with prices and supply and demand in the others") *quoting United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 600 (S.D.N.Y.1958); *RSR Corp. v. FTC,* 602 F.2d 1317, 1322–24 (9th Cir. 1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 596 (S.D.N.Y.1958).

Turning to the advertising market, there is already some competition between the *Times* and the *Daily Record* in the market for regional advertisers, such as automobile dealers, furniture stores, mall stores, and department stores. Even if the *Times* and the *Daily Record* do not compete for the same readers, the fact remains that they compete for the same regional advertisers, and that an advertiser will spend more money in the newspaper that provides it with the better value.

This regional advertising market, which is crucial to all three papers' successes, would undoubtedly be affected by any combination

of the *Times* and the *Morning News*. Such a combination would have a dominant market share and would become a "must buy" for regional advertisers. Thus, any monopolistic increase in the combination's advertising rates would soak up all the available advertising revenue and leave the *Daily Record* with less.

The existence of the "must buy" phenomenon was testified to by a range of experts and industry personnel, including Walter E. Hussman, the owner of the *Democrat–Gazette* who testified at length about the Little Rock newspaper war between the *Democrat* and the *Gazette*. He explained that, at one point, the *Gazette*, which had a dominant market share, raised its advertising prices. The *Democrat* expected to get more advertising as a result, but just the opposite occurred. Because of the circumstances and the respective circulations of the two papers at the time, advertisers at least thought that they had no choice but to advertise in the *Gazette*, and, since that took more of the advertisers' dollars, there were fewer dollars left to spend on advertising in the *Democrat*.

Moreover, the evidence established that the parties to this suit recognize the existence of a "must buy" phenomenon. The advertising managers at the *Morning News*, after the November 1, 1994, merger, decided to keep advertising rates below other similarly sized newspapers in order "to get the product established as the main advertising buy in Northwest Arkansas." Then, "[w]hen we raise rates, we want our advertisers to cut their lineage in the Times and the Daily Record, not the News." (Pl.Ex. 44 at DONR–10702). *See Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 600, 73 S.Ct. 872, 876, 97 L.Ed. 1277 (1953) (since plaintiff's competitor was "the 'dominant' newspaper in New Orleans; insertions in that paper were deemed essential by ad-

vertisers desiring to cover the local market.").

With less regional advertising, the *Daily Record* loses revenue and becomes a less attractive newspaper. Thus, common ownership of the *Times* and the *Morning News* would undoubtedly impact this regional advertising market, which is clearly a critical part of newspaper revenue.

For all these reasons, the court considers the local daily newspaper market to be Northwest Arkansas.[15] Having set out the boundaries of the relevant market, the court will now explain why it believes that both private plaintiffs have demonstrated a threat of antitrust injury, after which the court will consider the merits of whether this acquisition may substantially lessen competition in the relevant market.

## VII. ANTITRUST INJURY

█ To have standing to challenge NAT's acquisition of the *Times*, private plaintiffs must demonstrate that the acquisition threatens to injure them, and that this injury would be an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). The court concludes that both private plaintiffs have demonstrated a threat of antitrust injury.

### a. CPI's Antitrust Injury

In order to show a threat of antitrust injury, a competitor plaintiff must show that the challenged acquisition threatens to cause injury or "loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 485, 93 L.Ed.2d 427 (1986), 479 U.S. at 115, 107 S.Ct. at 492; *Pacific Ex-*

---

**15.** Even if it were to be found that the relevant geographic market was the Fayetteville Metropolitan Area, as the government defines it, there would still clearly be a violation of Section 7 because the *Times* and the *Morning News* compete in that area, without question. Thus, the result would be the same with the possible exception of available remedies. If such a finding resulted in the remedy of rescission not being

available, the court would employ what it believes to be the second best remedy under the facts of this case—divestiture. However, as Shearin is an advertiser in the *Morning News*, it is a consumer in the Fayetteville market and rescission would still be available on the basis of its standing in that market. See a discussion of these issues under Section X of this opinion.

*press, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 818 (9th Cir.1992) ("In order to demonstrate that it suffered antitrust injury, [a competitor plaintiff] must show that its injury was caused by anticompetitive or predatory aspects of [defendant's] conduct") *cert. denied,* ——— U.S. ———, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95, 100–102 (5th Cir.1988) (competitor plaintiff lacks standing to challenge an acquisition unless it can prove a threat of anticompetitive or "predatory behavior"), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1996, 100 L.Ed.2d 228 (1988).

■ As the Fifth Circuit noted in *Phototron, supra,* the antitrust injury requirement as phrased in *"Cargill* has imposed significant barriers to competitor attempts to enjoin merger transactions." *Id.* at 102. These barriers to competitor plaintiffs were not raised by accident. Many mergers have valuable pro-competitive effects, and a rival has every incentive to challenge such pro-competitive mergers simply because they are pro-competitive. Competitors are threatened by legitimate competition, and thus have an incentive to believe that rivals are violating antitrust laws and to use an antitrust suit to delay or moderate competition. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344–346, 110 S.Ct. 1884, 1895, 109 L.Ed.2d 333 (1990) (ARCO); William H. Page and Roger D. Blair, *Controlling the Competitor Plaintiff in Antitrust Litigation,* 91 Mich.L.Rev. 111 (1992); II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 373 (rev. ed. 1995). In fact, the risk posed by competitor suits is so great that in *Cargill,* the Department of Justice argued that the court should adopt a *per se* rule against competitor standing to enjoin the merger of rivals. *Cargill,* 479 U.S. at 120–122, 107 S.Ct. at 495. The court declined to take such a radical step, but its final ruling did not leave competitor plaintiffs a very good chance of having standing to enjoin mergers. However, this is one of those rare cases where the court believes that a competitor plaintiff has successfully proved a threat of antitrust injury.

In this case, there are various threats to CPI's profits that are caused by anticompeti-tive aspects of the transaction. The court has already described the "must buy" phenomenon, whereby the *Times* and the *Morning News* will have such a dominant market share that any monopolistic increase in the combination's advertising rates would soak up all the available advertising revenue. This "must buy" phenomenon, under which a price *increase* can actually injure competitors, is something which does not exist in most industries. While always harmful to consumers, monopolistic price increases usually benefit surviving competitors, who are able to expand their market share. Thus, in the typical situation, a price increase by the dominant market firm does not cause an antitrust injury. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585, n. 8, 106 S.Ct. 1348, 1355, n. 8, 89 L.Ed.2d 538 (1986) (horizontal price-fixing agreement can never harm a non-participating rival, who should actually benefit from the increased prices).

But the unique circumstances of the newspaper industry requires a different analysis. A monopolistic price increase by the *Morning News* and the *Times* would harm not only readers and advertisers, but also competitors like the *Daily Record.* That harm to the *Daily Record* would not be caused by increased efficiency due to the acquisition, but rather due to its monopolistic practices made possible by the acquisition. *Cf. Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 120–122, 107 S.Ct. 484, 495, 93 L.Ed.2d 427 (1986) (no antitrust injury to competitor plaintiff who was threatened by lost profits due to lower product prices allowed by the challenged merger).

A second source of antitrust injury concerns the possible termination of a news and advertising sharing agreement that is currently in effect between the *Times* and the *Daily Record.* The agreement was reached in 1993 for the purpose of making the *Times* and the *Daily Record* more competitive against the Donrey papers in Springdale and Rogers, which were already sharing news and advertising prior to their merger into the *Morning News.* But if the *Times* and the *Morning News* come under common ownership, the *Times* will no longer have any

incentive to help the *Daily Record* compete against the *Morning News*. The *Times* will thus have an anticompetitive incentive to terminate its arrangement with the *Daily Record*, even if the *Times* becomes less competitive with the *Morning News* as a result. The court realizes that this news and ad sharing agreement is terminable-at-will, but the fact remains that NAT's acquisition of the *Times* creates an anticompetitive reason to terminate the agreement where none existed before. This creates the requisite threat of antitrust injury both to newspaper readers throughout Northwest Arkansas and to the *Daily Record*.

Before leaving the subject of CPI's antitrust injury, the court specifically rejects CPI's argument that it is entitled to a presumption of antitrust injury simply because the challenged acquisition is presumptively illegal using market share data. CPI argued that the court may make this presumption under *R.C. Bigelow, Inc. v. Unilever*, 867 F.2d 102, 111 (2d Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). To the extent that *Bigelow* stands for this proposition, it is rejected as contrary to Supreme Court precedent.

■■■ No violation of the antitrust laws, even if *per se* or presumptive, can ever create a presumption of antitrust injury. This point was made clear by the Supreme Court in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (ARCO). In *ARCO*, the Court held that even a retail price maintenance scheme, which is a *per se* violation of the antitrust laws, does *not* create any kind of presumption of antitrust injury to competitors. Of particular relevance to CPI's contentions in

this case, the Court expressly cited *Cargill* for the proposition that even when a merger is assumed to be illegal based on market share data, that merger does not create a presumption of antitrust injury to competitors. *ARCO*, 495 U.S. at 340, 110 S.Ct. at 1892, *citing Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).[16]

### b. Shearin's antitrust injury

■■■ Because protecting consumers from monopoly prices is the central concern of antitrust law, consumers have usually been the preferred plaintiff in private antitrust litigation. *See* II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 370 (rev. ed. 1995). In this case, plaintiff Shearin alleges in the complaint that a possible combination of the *Times* and the *Morning News* will raise advertising rates as a result of their dominant market position. Thus, Shearin alleges that it faces a threat of monopoly prices for advertising in the *Morning News*. The reality of this threat is that advertising rates are much lower in Northwest Arkansas than in comparably sized local daily newspaper markets. As the threat of raised prices due to market power is a primary concern of Section 7, the court believes that Shearin has demonstrated antitrust injury.

### VIII. COMPETITION MAY BE SUBSTANTIALLY LESSENED

■■■ A combination is presumed to violate Section 7 if the market is sufficiently concentrated and the challenged acquisition would significantly enhance concentration. The seminal case on this matter is *United States*

---

**16.** Actually, this court believes that even *Bigelow* required some *proof* that there was a threat of predatory or anticompetitive conduct. In *Bigelow*, a merger was presumptively illegal based on market share data, but on summary judgment, the district court held there was no evidence of a threat of antitrust injury "absent some evidence of past instances of predatory pricing or present intent to engage in predatory behavior following the merger...." *Bigelow*, 867 F.2d at 105. The court of appeals reversed since Lipton's 84% post-merger market share "threatened to be decisive," giving Lipton the ability to engage in predatory conduct and "eliminate competition in that market by, *inter alia*, reducing [plaintiff's] access

to supermarket shelf space for its products." *Id.* at 111. *Bigelow* has been criticized for holding that a threat of predation may be uncritically presumed from market share data. Facts other than market share must be known before a market can *realistically* be judged susceptible to predation. II Phillip E. Areeda & Herbert Hovenkamp *Antitrust Law* ¶ 373d2, 373d4 (Rev. ed. 1995); William H. Page and Roger D. Blair, *Controlling the Competitor Plaintiff in Antitrust Litigation*, 91 Mich.L.Rev. 111 (1992). *Cargill*, 479 U.S. at 119 n. 15, 107 S.Ct. at 494 n. 15 required a realistic threat of predation, and the court finds that facts indicating such a realistic threat are present in this case.

**1168**

v. *Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), where the Court adopted a presumptive standard of illegality for horizontal mergers based on concentration ratios and market shares.

> [I]ntense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.... Such a test lightens the burden of proving illegality only with respect to mergers whose size makes them inherently suspect....

*Id.*, 374 U.S. at 363, 83 S.Ct. at 1741. In *Philadelphia Nat'l Bank*, the Supreme Court held presumptively illegal a merger resulting in a single firm controlling 30% of a market in which four firms had 78% of the sales. In *Times Mirror*, 274 F.Supp. at 622, the court found a prima facie violation of the Clayton Act where the acquiring newspaper's share of total weekday circulation climbed from 10.6% to 54.8%. The exact numerical threshold that creates the presumption is a subject of debate. For a table of cases, and the market data involved in each case, *see* IV Phillip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 909 pp. 31–51 (1980), and 3 Julian O. von Kalinowski, *Antitrust Laws & Trade Regulation* §§ 26.02[2] n. 62, 26.02[3] n. 111 (1994).

■ A review of the case law reveals that the market shares, concentration ratios, and Herfindahl–Hirschman Indexes are so high in this case that the acquisition is clearly presumptively anticompetitive. Based on circulation figures, the *Morning News* has 59% of the market, the *Times* has 25.4%, and the *Daily Record* has 15.7%. Based on advertising revenues, the *Morning News* has 57% of the market, the *Times* has 31%, and the *Daily Record* has 13%. Thus, the combination of Stephens-owned newspapers in Northwest Arkansas will have in excess of 84% of circulation and 88% of advertising revenue.[17] Even if the *Democrat–Gazette* came out with a zoned edition, and achieved the circulation and advertising goals considered realistic in internal prelitigation memorandum, the market would still be extremely concentrated.

■ At this point, defendants have an opportunity to show why the acquisition will not be anticompetitive and why the presumption of anticompetitive effects should not apply. *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982–83 (D.C.Cir.1990). Defendants commonly argue, as they have in this case, that the barriers to entry in a certain market are so low, that if a market participant behaves monopolistically by raising prices or reducing output, new competitors will enter the market, and the market will correct itself. *Id.* at 987. While normally a valid argument, this contention is specious in the context of the local daily newspaper industry. The barriers to entry are universally recognized as formidable, as is supported by the fact that in the entire nation every major city newspaper market is a monopoly except for approximately eight. Only WEHCO faces reasonably low barriers to entry with a zoned edition of the *Democrat–Gazette*, and as the court explained above, the market is so concentrated that WEHCO's entry would not significantly dilute the mar-

---

17. While the court was impressed with the sincerity and honesty of Mr. Jack Stephens and every other witness from his organization who testified, the court is still left with the gnawing feeling that it is inevitable that someday, maybe sooner rather than later, the newspapers will be operated as one and the *Northwest Arkansas Times* will disappear from the scene just as two other venerable hometown papers, the *Springdale News* and the *Rogers Daily News* have disappeared under the Stephens family ownership. It simply makes economic sense, and humans, being the type of animal they are, almost always act in their own best interests. There appears to be little dispute but that the *Times* simply was not worth, as a stand-alone newspaper, what Jack Stephens paid for it. It is worth more if it is operated in conjunction with other Stephens owned papers in the area, so the court is certain that, sooner or later, that will happen irrespective of how sincere Mr. Stephens' present protestations to the contrary are.

ket. Moreover, entry by WEHCO becomes extremely unlikely if this acquisition is allowed to stand because one combination of newspapers will have a dominant market share in the region.

Defendants also argue that it is improper to aggregate the market shares of the *Times* and the *Morning News*, because NAT and Donrey are separate entities and do not share a common parent. The court does not consider this argument to be tenable.

In the first place, both NAT and Donrey have virtually complete overlap of ownership by various members of the Stephens family. Donrey is ninety-nine percent (99%) owned by Stephens Group, Inc. (SGI), and SGI is owned entirely by Stephens family trusts.[18] The same Stephens family trusts also own ninety-five percent (95%) of NAT's stock.[19] At the current time, Jack Stephens is chairman of the board of SGI, Donrey and NAT, and his executive assistant, Scott Ford, is NAT's president. NAT has submitted proposed changes in ownership and management for the express purpose of persuading the court to let the Stephens family retain ownership of the *Times* with a slightly different structure. Under this proposal, various members of the Stephens family would still own ninety-five percent (95%) of NAT's stock, but these same family members would only own 20% of SGI and Donrey.[20] In addition, Warren A. Stephens would replace his father, Jack Stephens, as NAT's chairman, and George Smith, the current publisher of the *Times*, would replace Scott Ford as president.

Even with the proposed changes, the Stephens family members have little, if any, incentive to compete aggressively against themselves. It is apparent to the court, and the Stephenses can be proud, that the bonds of filial loyalty are well developed in this family which regularly makes joint investments together amounting to millions upon millions of dollars. As Warren Stephens testified at trial, the Stephens' family investment philosophy is to take a long term approach and to "think in terms of generations ... in terms of building value for—for our family."

The Stephens family investing is marked by a cooperative and trusting spirit that one would not expect to find in a competitive business situation, as one can see from the way in which NAT acquired the *Times*. SGI dividends were used by the Stephens family to purchase NAT. The exact proportions of NAT ownership was a trifling matter that was to be determined by accountants. Jack Stephens and his sister, Bess Stephens, provided NAT with thirteen million dollars in loans, which were reflected in promissory notes that were both unsigned and unsecured. With regard to the family trusts themselves, members of the Stephens family serve on each other's trusts as trustees and vote each other's stock in the event of an incapacity.

Not only the bonds of filial affection and loyalty, but also clear economic self-interest,

**18.** The Class A Common Stock of SGI, which is the voting stock, is owned by four Stephens family trusts as follows.

49.5% J.T. Stephens Trust One
49.5% Bess Stephens Trust
0.5% Warren A. Stephens Trust
0.5% W.R. Stephens Trust

The Class B. Common Stock of SGI, which is non-voting stock, is also owned by a number of Stephens Family trusts as follows.

40.0% J.T. Stephens Trust One
39.1% Bess Stephens Trust
0.9% Bess Stephens Individually
9.975% Warren A. Stephens Trust
0.025% Warren A. Stephens Trust One
3.33% W.R. Stephens, Jr. Rev. Trust
3.33% Pamela Stephens Rose Trust One
3.33% Elizabeth Ann Stephens Campbell Rev. Trust One

**19.** NAT is a limited liability corporation. Thus, there is only one class of NAT stock, and it is voting stock.

12.075% J.T. Stephens Trust One
12.075% Bess Stephens Trust
36.675% Warren A. Stephens Trust
11.892% W.R. Stephens, Jr. Rev. Trust
11.892% Pamela Stephens Rose Trust One
11.892% Elizabeth Ann Stephens Campbell Rev. Trust

**20.** The proposed ownership structure of NAT is as follows:

47% Warren A. Stephens Trust
16% W.R. Stephens, Jr. Rev. Trust
16% Pamela Stephens Rose Trust One
16% Elizabeth Ann Stephens Campbell Rev. Trust

will deter Warren A. Stephens and his cousins, the 95% owners of NAT, from vigorously competing with the *Morning News*, Donrey, and SGI.[21] In addition to the 20% of SGI non-voting stock held by Warren A. Stephens and his cousins, the Stephens children know they will one day inherit the rest of the stock of SGI from their parents, Jack Stephens and Bess Stephens. In fact, the elder Stephenses, for tax reasons, have a clear intent to pass assets from themselves to their children while they are still alive.

Thus, the Stephens children, as owners of the *Times*, will have little, if any, economic incentive to cause the *Times* to compete in the market place at the expense of their current and future asset, the *Morning News*. Both newspapers are part of the family's "investment body" and human nature is such, and the motive of self preservation is so strong, that one doesn't allow one part of that body to harm another part, at least not for long.

In a competitive situation, the *Times* might attempt to take readers away from the *Morning News* by, for example, hiring more experienced reporters at higher salaries or spending more money on color printing. The payoff would be an increase in the *Times'* circulation and value. In the current non-competitive situation, these investments would never be made, as SGI and the Stephens family would bear not only the cost of improving the *Times*, but also the decrease in the *Morning News'* value. The corresponding increase in the value of the *Times* would no longer be such an attractive payoff.

Conversely, in a competitive situation, the *Morning News* would have incentive to make gains at the expense of the *Times*, but in the current situation, the elder Stephenses, as owners of the Donrey paper, would have little incentive to take money from the pockets of their children, which they will inherit in any case. This situation will certainly not be helped any by the thirteen million dollars in unsecured loans to NAT which should reduce the elder Stephenses' desire to see the *Times* go out of business, something a competitor would normally desire.

Even to the extent that the Stephens family does not directly interfere with management decisions or share information, the fact remains that the employees of Donrey and NAT know who their "bosses" are, and, again, it is simply human nature to try to please the persons who have control over the employees' fate. In that respect, after having seen and heard Jack Stephens testify, and after hearing and seeing evidence in respect to how the Stephens family does business, and apparently always has, the court is convinced that everyone in that exceptionally well run organization with wide ranging business interests knows who's "boss." In fact, the court suspects that Jack Stephens is such a strong personality that his wishes are usually carried out without the necessity of direct orders from him. "They" just intuitively know what he wants and they do it.

If the responsible person in any of the separate and supposedly independent family businesses get the message, in whatever form, as to his desire in respect to that business, it's done, as evidenced by Donrey's dropping the *Times* acquisition like a hot potato simply because one of Stephens' employees, as he exited the airplane in Fort Smith, told a Donrey officer that the family, not Donrey, would buy the *Times*. The word was that Stephens wanted it that way, so that's the way it would be.

Even in the time since the litigation commenced, George Smith, the publisher of the *Times*, has testified that, despite public proclamations to the contrary, he did not really intend to become the dominant newspaper in Northwest Arkansas. Rather, he had decided that the best business decision would be to focus exclusively on his "home turf" in Fayetteville. All it would take is a similar realization by the publishers at the *Morning News*, that they should give up their regional aspirations and focus on their "home turf" in Springdale and Rogers, and you effectively have a market division agreement.

In sum, it is clear to the court that the various members of the Stephens family do

---

**21.** The remaining 5% of the *Times* is owned by members of a "special investments group" comprised of SGI employees hand-picked by Jackson Stephens to participate in the investment.

not pursue separate interests or compete against each other in any way. NAT and Donrey may as a technical matter be separate legal entities, but in practical effect, NAT's acquisition of the *Times* may substantially lessen competition between the *Times* and the *Morning News* and in the Northwest Arkansas local daily newspaper market. This is all that is required to find violation of Section 7.

In a previous ruling, the court framed the issue slightly differently. In *Community Publishers, Inc. v. Donrey Corp.*, 882 F.Supp. 138 (W.D.Ark.1995), the court held that the question was whether Donrey *indirectly* acquired the *Times* when it was purchased by NAT. While the court still believes the reasoning and precedent cited in support of that holding applies to this case, it seems more elegant to simply ask whether NAT's acquisition of the *Times* may substantially lessen competition, which is all that is required under Section 7. As explained above, the answer is "yes." The court also finds that Donrey indirectly acquired the *Times.*

Although NAT and Donrey are technically separate entities, the court previously examined cases where, "[i]n varying contexts, the courts have refused to take a formalistic approach to corporate structures in order to effectively implement the antitrust laws." *Id.* at 140–41. In the subsequent course of litigation, the parties have brought the court's attention to further cases that support its prior ruling, and the court will discuss these cases given the novel nature of this question.

Defendants argue that, as a matter of law, Donrey has not indirectly acquired the *Times,* and NAT's acquisition will not substantially lessen competition, because NAT and Donrey are not owned by a common parent or some single person or firm. The court considers *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016 (S.D.N.Y.1979) to be directly contrary to this argument. In *Julius Nasso,* a construction materials firm was acquired by a joint venture of three construction companies and/or by "individuals said to be in control of the joint venture." *Id.* at 1018. In either case,

the court found that the case was cognizable under Section 7 and denied a motion to dismiss. As in this case, if the ownership was traced back far enough, a cluster of noncompeting shareholders, none with majority status, would be found.

Defendants also argue that there is no precedent for aggregating the shares of stock held by the Stephens family, and yet in *American Crystal Sugar Co. v. Cuban–American Sugar Co.*, 152 F.Supp. 387, 392 (S.D.N.Y.1957), *aff'd,* 259 F.2d 524 (2d Cir. 1958), the court clearly thought it appropriate to do so. In *American Crystal,* the court found it necessary in a Section 7 action to calculate defendant's percentage of stock ownership in a competitor, and so included shares owned by defendant's chairman of the board and his "immediate family and other persons likely to accept his advice." *Id.* at 392.

There is also a group of cases arising under Section 1 of the Sherman Act, where the court determined that two or more legally separate and distinct entities are not distinct for purposes of antitrust law if they are not "independent sources of economic power ... pursuing separate interests." *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). While the specific holding of *Copperweld* is that a parent cannot conspire with a subsidiary, "[t]he thrust of the holding is that economic reality, not corporate form, should control the decision of whether related entities can conspire." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.*, 838 F.2d 268, 275 (8th Cir.1988). Moreover, "the logic of *Copperweld* reaches beyond its bare result, and it is the reasoning of the Court, not just the particular facts before it, that must guide our determination." *Id.* at 274.

In *Mount Pleasant,* the Eighth Circuit held that the individual cooperatives making up a rural electric cooperative association could not have conspired under Section 1, as a matter of law. In words that could just as easily apply to this case, the court held that "the cooperative organization is a single enterprise pursuing a common goal" and that "there is no evidence that any defendant has ever pursued interests antithetical to those of

the cooperative as a whole." *Id.* at 276. The court also commented that "[e]ven though the cooperatives may quarrel among themselves on how to divide the spoils of their economic power, it cannot reasonably be said that they are *independent sources* of that power." *Id.* at 277 (emphasis in original). As in this case, the Stephens family is a cooperative venture where the individual members never pursue antithetical interests, and where the spoils of economic power may be divided up this way and that, but where it cannot reasonably be said they are independent sources of power.

Similarly, the Court of Appeals for the Fifth Circuit disregarded corporate formalities in *Century Oil Tool, Inc. v. Production Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir.1984), where the court described the two defendant corporations as follows:

> Production Specialties and Gas Lift were separately incorporated and commonly owned by three men, two of whom owned 30 percent of each corporation and one of whom owned the remaining 40 percent of each corporation. All three men served as directors and officers of each corporation.

As in this case, no single shareholder had majority status in even one corporation, and yet both corporations were found to be under common control such that they could not legally conspire.

Finally, the parties have briefed in detail a line of cases where it is held that when a single firm is a minority stockholder in a competitor, it may substantially lessen competition under Section 7. *See e.g. United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *American Crystal Sugar Co. v. Cuban–American Sugar Co.*, 152 F.Supp. 387, 392 (S.D.N.Y.1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958). In such cases, a single entity has control over at least one firm and then substantial minority ownership of a competitor. Such cases differ dramatically from the facts of this case, where no single member of the Stephens family has control over either NAT or Donrey. However, to the extent that these minority ownership cases provide guidance in this case, it is that a firm need not exercise technical, legal control over a corporate competitor in order to lessen competition. Evidence that the minority stock ownership allows one firm to control the other and may substantially reduce competition will suffice. Usually, this will be evidence of actual control or intent to control by the minority shareholder.

In this case, to the extent that it is analogous to the minority ownership cases, the evidence that the overlapping minority ownership of NAT and Donrey may substantially reduce competition is the evidence of familial and economic ties that forever and irrevocably bind the Stephens family.

> This case provides a perfect example of the fluidity of corporate forms and the potential dangers they present. Donrey and NAT essentially share a common genetic imprint, i.e., ownership by various Stephens family trusts. Such a corporate "cloning" procedure should not be allowed to create large loopholes in Section 7.

*Community Publishers*, 882 F.Supp. at 140.

## IX. REMAINING CAUSES OF ACTION

As the court believes NAT's acquisition of the *Times*, and Donrey's indirect acquisition, violate Section 7 of the Clayton Act, it will be unnecessary to consider the claims arising under Section 1 of the Sherman Act involving contracts in restraint of trade and Section 2 of the Sherman Act involving monopolization and attempts to monopolize.

■ Section 7 of the Clayton Act is the principal antitrust statute applicable to mergers and acquisitions. 3 Julian O. von Kalinowski, *Antitrust Laws & Trade Regulation* § 23.01 (1994). However, Sections 1 and 2 of the Sherman Act are applicable as well. *Id.* at § 23.01[1], [2].

■ With regard to Section 1 of the Sherman Act, anticompetitive acquisitions can violate that section, presumably as a combination in restraint of trade. *United States v. First Nat'l Bank & Trust Co.* 376 U.S. 665, 671–72, 84 S.Ct. 1033, 1037, 12 L.Ed.2d 1 (1964) ("where merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by merger or consolida-

tion, itself constitutes a violation of § 1 of the Sherman Act.").

There is not a great deal of merger and acquisition litigation under Section 1 of the Sherman Act, but it appears clear that mergers challenged under Section 1 should be evaluated by the same substantive standards as those applied under Section 7 of the Clayton Act. For instance, in *United States v. Rockford Memorial Corp.*, 898 F.2d 1278 (7th Cir.1990), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990), the court stated,

> We doubt whether there is a substantive difference today between the standard for judging the lawfulness of a merger challenged under section 1 of the Sherman Act and the standard for judging the same merger challenged under section 7 of the Clayton Act. It is true that the operational language of the two provisions is different and that some of the old decisions (old by antitrust standards anyway) speak as if that should make a difference. [citations omitted] A transaction violates section 1 of the Sherman Act if it restrains trade; it violates the Clayton Act if its effect may be substantially to lessen competition. But both statutory formulas require, and have received, judicial interpretation; and the interpretations have, after three quarters of a century, converged. 2 Areeda & Turner, Antitrust Law, ¶ 304 (1978); 4 *id.*, ¶ 906, at p. 22.

*Rockford*, 898 F.2d at 1281–82. *See also McCaw Personal Communications v. Pacific Telesis Group*, 645 F.Supp. 1166, 1173 (N.D.Cal.1986) ("the standard ... under the Sherman Act is similar, if not identical, to that under the Clayton Act").

Given this convergence of legal standards, according to Areeda and Turner, "[a]s a practical matter, Sherman Act § 1 is now largely superfluous in merger litigation, except for some regulated firms or pre–1980 mergers." IV Phillip E. Areeda & Donald F. Turner, Antitrust Law, ¶ 906 (1994 Supp.) (footnotes omitted).

Rather than decide whether Section 1 is superfluous in the context of mergers and acquisitions, this court will hold that it is unnecessary to reach the Section 1 claim, since it is voiding the challenged acquisition under Section 7. This very route was taken by the Supreme Court in the case of *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), where the Court held that a challenged merger violated Section 7 of the Clayton Act and that, as a consequence, "we need not, and therefore do not, reach the further question of alleged violation of § 1 of the Sherman Act." *Id.*, 374 U.S. at 324, 83 S.Ct. at 1720. For the same reasons, it is not necessary to reach the alleged violation of Section 2 of the Sherman Act.[22]

It will also be unnecessary to reach private plaintiffs' claims arising under Section 8 of the Clayton Act involving interlocking directorates, and Section 7A of the Clayton Act involving government notification under the Hart–Scott–Rodino Amendments, because any possible relief that might be available under these provisions has already been awarded.

## X. REMEDY

Having concluded that Section 7 has been violated, we must now determine the appropriate remedy. "The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" *Ford Motor Company v. United States*, 405 U.S. 562, 573, 92 S.Ct. 1142, 1149, 31 L.Ed.2d 492 (1972) (citations omitted). Moreover, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334, 81 S.Ct. 1243, 1254, 6 L.Ed.2d 318 (1961). The court is "clothed with 'large discretion' to fit the decree to the special needs of the individual case." *Ford Motor*, 405 U.S. at 573, 92 S.Ct. at 1149 (citations omitted).

All plaintiffs ask for permanent injunctive relief: the private plaintiffs under Section 16 of the Clayton Act, 15 U.S.C. § 26, and the

---

**22.** It appears that Section 2 of the Sherman Act, which prohibits monopolization and attempts to monopolize, has been applied even less frequently than Section 1 to mergers and acquisitions.

government under Section 15 of the Clayton Act, 15 U.S.C. § 25. Private plaintiffs ask for relief in the form of divestiture or rescission. The government initially sought only divestiture but has filed a post-trial motion to amend its complaint to name Thomson as a defendant and seek the alternative relief of rescission.

Thomson contends that rescission is not an available remedy in a private suit and objects to any request on the part of the government for an order of rescission. It points out that the government did not name it as a defendant prior to trial and did not seek the remedy of rescission. It therefore contends it would be prejudiced by a post-trial amendment since it did not defend against the case presented by the government.

Thomson initially raised in a motion to dismiss the issue of the availability of rescission as a remedy in a suit brought by a private party.[23] We rejected this argument finding that we had the authority to order rescission if the court found such a remedy was warranted.

Our holding was in large part based on the Supreme Court's opinion in *California v. American Stores Co.*, 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). While that case dealt with the remedy of divestiture rather than rescission in the context of a private action brought under the Clayton Act, we find its reasoning persuasive and equally applicable to the equitable remedy of rescission.

In *American Stores*, the Supreme Court reviewed the holding of the Ninth Circuit Court of Appeals that divestiture was not an available remedy in private actions under Section 16 of the Clayton Act. The Court reviewed both the statutory language and the legislative history and concluded that the "plain text of § 16 authorizes divestiture decrees to remedy § 7 violations." *American Stores*, 495 U.S. at 282, 110 S.Ct. at 1859.

The Court concluded that Section 16's simple grant of authority to "have injunctive relief" would seem to encompass the remedy of "divestiture just as plainly as the comparable language in § 15." *Id.* at 281, 110 S.Ct. at 1859. Indeed, it noted a plausible argument could be made that the language of Section 16 was more expansive. *Id.* The Court quoted with approval the following language from *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 416 (1st Cir.1985): "'[§ 16] states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order.... Rather, the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief.'" *Id.*, 495 U.S. at 281, 110 S.Ct. at 1859. It concluded that "[s]ection 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, fits well in a statutory scheme that favors private enforcement, subjects mergers to searching scrutiny, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *Id.*, 495 U.S. at 285, 110 S.Ct. at 1861.

Section 16 was enacted "'not merely to provide private relief but ... to serve as well the high purpose of enforcing the antitrust laws.'" *Id.*, 495 U.S. at 284, 110 S.Ct. at 1860, *quoting, Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–131, 89 S.Ct. 1562, 1579–1581, 23 L.Ed.2d 129 (1969). Section 16 should therefore be applied "'with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *Id.* (internal quotation omitted). The Court cautioned that its holding did not "mean that such power should be exercised in every situation in which the Government would be entitled to such relief under § 15. In a Government case the proof of the violation of law may itself establish sufficient public inju-

---

23. Thomson also argued that Section 7 did not reach the conduct of a seller. We held it was appropriate to grant relief against sellers if necessary to eliminate the effects of an unlawful acquisition. *See United States v. Coca–Cola Bot-* *tling Co.*, 575 F.2d 222, 227 (9th Cir.1978), *cert. denied*, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). *See also United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326–31, 81 S.Ct. 1243, 1250–53, 6 L.Ed.2d 318 (1961).

ry to warrant relief." *Id.,* 495 U.S. at 295, 110 S.Ct. at 1866.

Thomson points out that not one party has cited a case in which rescission was authorized against a private party or in which rescission was utilized as a form of permanent injunctive relief. While this may be true, it is also true that no case cited by any of the parties or found by the court indicates that rescission is not an available remedy under Section 16. In fact, as we pointed out in ruling on the motion to dismiss, other courts have specifically held that rescission is an available antitrust remedy in a private antitrust suit. *See e.g., Arnett v. Gerber Scientific, Inc.,* 575 F.Supp. 770, 771 (S.D.N.Y.1983). Still others have mentioned the availability of rescission without any discussion of its applicability to a private action. *See e.g., State of New York v. Kraft General Foods, Inc.,* 862 F.Supp. 1030, 1034 n. 3 (S.D.N.Y.1993) (a court should not order rescission unless the seller's return to the industry is feasible under the circumstances and the remedy is the most effective way to cure the antitrust violation), *aff'd without op.,* 14 F.3d 590 (2d Cir.1993).

The seller's awareness that an antitrust challenge will be made to the pending merger or acquisition has also been said to be relevant to the possibility of involving the seller in the order of relief. *United States v. Reed Roller Bit Co.,* 274 F.Supp. 573, 592 (W.D.Okla.1967). It is well established that "where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the *status quo.*" *Porter v. Lee,* 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1956). (citation omitted).

As the parties are aware, the court is concerned that the parties acted with such speed in closing this transaction despite their knowledge of the private plaintiffs' complaint seeking injunctive relief and despite their knowledge that a hearing had already been set on the motion for temporary restraining order.

A Thomson representative was served with a complaint and a motion for temporary restraining order or preliminary injunction on February 5, 1995, and was advised the request for injunctive relief would be heard by the court on February 7, 1995. The sale was closed during the afternoon of February 6, 1995. As private plaintiffs point out, had the court's schedule allowed it to hold the hearing the morning of February 6, 1995, the court could have enjoined the sale holding the parties in status quo. However Thomson, with knowledge of the pending motion for preliminary injunction, chose to consummate the sale and now suggests that the court has no authority to rescind the transaction in question.

The court believes that is fair to say that Thomson executives went into this transaction "with their eyes wide open." They were paid handsomely to gamble that this hurried up transaction would withstand antitrust scrutiny. They took the gamble they were paid to take.

 Both divestiture and rescission require the dispossession of the specific interest that created the unlawful monopoly or market power. The relief authorized by the Clayton Act does not end with dispossession of the unlawful interest but may include other measures designed to undo what was achieved through the unlawful acts. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057 (1957) (relief must be directed to that which is necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute); *United States v. Paramount Pictures,* 334 U.S. 131, 171, 68 S.Ct. 915, 936, 92 L.Ed. 1260 (1948). The court's exercise of its equitable powers is not designed to be punitive and the decree should be no harsher than necessary to accomplish effective relief. *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 603, 71 S.Ct. 971, 977, 95 L.Ed. 1199 (1951) (concurring opinion).

The court need not resort to either rescission or divestiture if some other equitable relief suffices to provide an effective means of eliminating the illegal effects of the acquisition and is in the public interest. The court's equitable powers are to be exercised to restore as nearly as possible the competitive situation that existed before the asset

acquisition. However, it is clear from the case law that divestiture is regarded as the preferred remedy.

■ "Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 330–31, 81 S.Ct. 1243, 1252–53, 6 L.Ed.2d 318 (1961). Divestiture serves several functions: (1) it puts an end to the combination, conspiracy, or acquisition that was in itself unlawful; (2) it deprives the antitrust defendants of the benefits of their actions; and (3) "[i]t is designed to break up or render impotent the monopoly power which violates the Act." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128–29, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1948). Further, the Supreme Court has said that "[c]omplete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws." *Ford Motor*, 405 U.S. at 573, 92 S.Ct. at 1150.

Both private plaintiffs and the government contend that a complete remedy will only be afforded if the *Times* is placed in the hands of owners who are completely independent of NAT and Donrey. It is suggested that this can be accomplished in one of three ways: (1) sale by an independent trustee; (2) rescission; or (3) sale by NAT, L.C. Plaintiffs contend that divestiture through an independent trustee is the most effective remedy. They suggest an independent trustee who is given the power and incentive to maintain the value and competitive ability of the *Times* could be directed to sell the assets to a person who is competitively suitable and capable of managing the *Times* effectively, and who is not affiliated with the Stephens family or Donrey. In plaintiffs' opinion this would ensure the *Times* remains an independent entity, competing against Donrey, and it would remove much of the suspicion that would surround a sale by one of the parties.

According to the private plaintiffs, allowing NAT to sell the *Times* itself would be the least satisfactory of the three possible remedies. In their view, if NAT is allowed to sell the *Times*, the owners of Donrey will have the opportunity to choose Donrey's competitor in the market. This would allow Donrey's owners to sell to someone who in their view would be a weak competitor, someone against whom the *Morning News* would ultimately prevail. Furthermore, it is suggested that NAT's owners might drag their feet in the sale and possibly permit the *Times* to deteriorate in the meantime.

NAT suggests either no remedy is needed or if the court believes some type of relief is warranted, then the court is urged to adopt some type of permanent hold separate order or other equitable remedy short of divestiture or rescission. NAT points out that the court has broad equitable powers and that injunctive relief is not mandated by the finding of a violation of the antitrust laws.

NAT reminds the court that it has expressed a strong desire to own and independently operate the *Times* and has demonstrated a commitment to making significant capital investments. According to NAT, its

> investors have promised to keep the *Times* independent and nurture it into the best possible newspaper of its size anywhere. Many times such statements might ring hollow. Yet, considering the reputations of those who made the promises, they could have been carved in stone. Consideration of all of these facts should lead to the conclusion that if NAT's ownership of the *Times* results in anticompetitive consequences, harm to the public interest will not be remedied by the creation of a situation where more anticompetitive consequences arise in a different form.

A similar argument was rejected by the Supreme Court in *Ford Motor Co. v. United States*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). In that case Ford Motor Company had purchased certain assets of Electric Autolite Co., an independent manufacturer of spark plugs and other automotive parts. The government challenged the acquisition. The lower court ordered the divestiture of the Autolite plant, the Autolite trade name and additional ancillary relief. Ford argued that under its ownership Autolite became a more effective competitor against other spark plug manufacturers than

it had been as an independent and that there were other benefits resulting from the acquisition. The Supreme Court rejected the argument that any asserted beneficial effect of the acquisition somehow alleviated the need for a remedy. The court stated:

It is argued, however, that the acquisition had some beneficial effect in making Autolite a more vigorous and effective competitor against Champion and General Motors than Autolite had been as an independent. But what we said in *United States v. Philadelphia National Bank, supra,* disposes of that argument. A merger is not saved from illegality under § 7, we said,

because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anti-competitive mergers, the benign and malignant alike, fully aware, we must assume, that some price might be paid.

*Id.,* 405 U.S. at 569–70, 92 S.Ct. at 1148, *quoting United States v. Philadelphia National Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 1745–46, 10 L.Ed.2d 915 (1963).

Under the circumstances of this case, we believe no effective remedy can be devised that would allow NAT or its owners to retain an interest in the *Times.* To allow NAT to continue operating the *Times* under either the present ownership structure or the proposed structure would only serve to perpetuate the anticompetitive effects of the acquisition. Under either ownership structure, the economic interests of NAT's owners converge with the economic interests of Donrey's owners. In fact, as we pointed out earlier the ownership of the entities is substantially identical.

As the court has earlier indicated, it feels a great burden in attempting to do "the right thing" for all concerned. In spite of the violation of law that it has found, the court has no desire to punish anyone. The law doesn't provide for or allow that. Instead, it

is this court's fervent hope that what it does in this case does not provide a cure that is worse than the disease, something that the court has recognized throughout these proceedings might be the outcome of all of this. It is the court's desire and intention that what it does will result in giving the *Times* its best chance to survive and provide the readers of Northwest Arkansas a fine newspaper for many years to come.

The court recognizes that divestiture is the preferred remedy in cases such as this, but the court has a great deal of concern about whether that is best for either the parties or the citizens of Northwest Arkansas under the particular circumstances of this case.

One method to accomplish divestiture is to allow NAT to sell the paper. However, the court is convinced that allowing NAT to sell the paper within a prescribed time is not a viable alternative or the right one. As plaintiffs point out, that gives NAT's present owners too much control over the ultimate fate of the *Times.* If they were of a mind to do so, they could make certain that the *Times* came out of all of this less able to compete with their other very powerful and very valuable newspaper properties in this area.

As we noted above, if divestiture is ordered both the private plaintiffs and the government suggest that this should be accomplished by appointing an independent trustee. The court agrees. The *Times* has already been under common ownership with the *Morning News* since February. As the government points out, the public interest is injured each day that competition is prevented under this arrangement. A number of witnesses testified at trial that the competition between the *Times* and the *Morning News* has, in their view, already lessened in a number of almost imperceptible ways.

The government points out that the trustee could be directed to ensure that the *Times* is operated as an ongoing independent newspaper, limiting, to the extent possible, the transfer of confidential financial and other information to Donrey, Stephens family members, or their representatives and agents. It is suggested that a period of

three months should be sufficient to sell the assets of the *Times*.

The court's concern with divestiture through a independent trustee is that such a procedure would create a prolonged period of uncertainty in the market and would be expensive. It would also seem that this method would be least likely to insure that the *Times* would be sold for anything approaching fair market value. If potential purchasers knew that the trustee was required to sell the paper in a prescribed time, it is not likely that an offer would be received that would even come close to what would be paid for the paper in an arms length transaction. The sale would be a "fire sale."

Additionally, the court is concerned with the amount of disruption that would occur in the actual operation of the *Times*. The trustee would almost certainly be someone who is not associated currently with the *Times*, was unaware of its current operations, and would have to familiarize himself or herself with the newspaper market in this area before being able to successfully undertake the operation of the *Times* and attempting to sell the newspaper. Obviously, any trustee that the court could name could not, in the short period of time allowed by such method, come into this complex and highly competitive newspaper market and effectively compete with the capable "pros" already here. All of this process would be disruptive and might make it difficult for the paper to retain officers and other employees vital to its successful operation.

In short, the court firmly believes that the divestiture remedy would likely be a cure worse than the disease. The court has a great deal of fear that divestiture through a trustee would insure that the *Times* would come out of this litigation so weakened that it could not survive, to the detriment of all concerned, and especially its readers.

On the other hand, the remedy of rescission has a great deal of appeal. In light of the preliminary injunction order which has been in place since two days after the transfer of the *Times*, the court would not be faced with the difficulties often encountered in attempting to rescind mergers or asset acquisitions. That is, there should be no difficulty in separating the assets and requiring the rescission of the asset purchase agreement.

Thomson is also obviously quite capable of re-entering the market. Thomson, of course, operated the *Times* for a number of years and is still in the newspaper business and knows how to run a newspaper in this competitive climate. They did it for years. Additionally, there have been few changes in personnel at the *Times*. Most of the officers and other employees at the paper were hired and placed there by Thomson. They know their "bosses" at Thomson, and know what is expected of them. Thus, one of the uncertainties that might otherwise cause high employee turnover would be removed. Presumably Thomson could virtually step in and continue where they left off before the sale.

One of the difficulties with this remedy lies in the fact that Thomson does not desire to operate or retain for any length of time the *Times*. Thus, the remedy of rescission would merely operate to transfer the *Times* back to Thomson who would apparently once again place the newspaper on the market. However, Thomson would naturally have a financial interest in once again obtaining top dollar for the newspaper and in operating it profitably and competitively in the interim.[24]

There is no evidence that there would be a lack of interested buyers in the event the sale was rescinded.[25] In view of the prelimi-

24. Thomson argues that it would be punished if rescission is ordered because the current market conditions including the chilling effects of this lawsuit on the potential sale of the *Times* would result in it being unable to obtain fair market value in its attempt to sell the *Times* to another interested party. The court notes that this difficulty, if it is a difficulty, was created at least in part by Thomson's decision to speedily close a transaction which it knew was being challenged under the antitrust laws.

25. NAT argues that there is little assurance that any bidders will come forward other than CPI and/or WEHCO. It notes that there were only four expressions of interest in the period of time the *Times* was on the market before NAT purchased the assets. Only nineteen days elapsed between Thomson's public announcement of the sale and the closing of the sale. This allowed little time for other interested bidders to come forward. Further, the court notes that Harring-

nary injunction order, rescission would be a simple, quick, and efficient method of restoring the competitive market as it existed prior to the challenged transaction. Until February of this year Thomson successfully ran the *Times* and is in the newspaper business. If Thomson once again desires to sell the *Times*, it clearly has the knowledge, business expertise, and wherewithal to accomplish such a sale. In fact, Thomson is currently working with a broker to sell twenty-four other newspapers.

Thus, it is clear that Thomson is eminently more qualified to run the newspaper or to sell it again, if that is its choice, than any trustee who could be found. The court concludes that, for these reasons, of all of the admittedly bad choices, rescission is the best one.

Having found the acquisition to be unlawful and having considered all alternatives, we conclude that rescission is the appropriate remedy under the circumstances of this case. Rescission will be prompt, serve as a means of redressing the violation, and is the most effective means of restoring competition. An order will be entered directing the rescission of the assets of the *Times*. The court will retain jurisdiction until the rescission is accomplished.

As we have concluded the private plaintiffs have standing and they specifically requested rescission and named Thomson as a defendant, we need not rule on the government's motion to amend its complaint to name Thomson as a defendant to also seek the remedy of rescission.

### JUDGMENT AND ORDER OF RESCISSION

This non-jury matter came on for trial to the court on May 1, 1995, through May 10, 1995. At the conclusion of the trial, the case was taken under advisement and the court directed the filing of post-trial briefs and proposed findings of fact and conclusions of law. By memorandum opinion of even date, the court has set forth its findings of fact and conclusions of law in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure.

For the reasons stated in the memorandum opinion the court finds that the challenged acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18. IT IS ORDERED AND ADJUDGED in accordance with the memorandum opinion that, within thirty (30) days of the date of this judgment defendants, NAT, L.C., and Thomson Newspapers, Inc., shall rescind the asset purchase agreement entered into between NAT and Thomson on February 6, 1995, for the purchase of the assets of the *Northwest Arkansas Times* by NAT, and restore all matters to the state in which they existed prior to the agreement between said defendants on January 27, 1995. During the time necessary to complete the rescission, the terms of the court's preliminary injunction order entered on February 10, 1995, shall remain in full force and effect.

The court retains jurisdiction until the rescission has been accomplished.

IT IS SO ORDERED.

ton testified that the *Times* was held separate from the other group of 24 papers Thomson was selling because the Fayetteville market was much more promising than the market areas of the other 24 papers.